UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CATHY LUTIZIO,<br><br>               Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>               Defendant. | CASE NO. 1:23-CV-01675-DAC<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**MEMORANDUM OF OPINION AND ORDER** |

## INTRODUCTION

Plaintiff Cathy Lutizio challenges the Commissioner of Social Security's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On October 11, 2023, the parties consented to my exercising jurisdiction pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #7). Following review, and for the reasons stated below, I **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. Lutizio applied for disability insurance benefits and SSI in April 2010, receiving an unfavorable decision in October 2012. (Tr. 102-25). In March 2014, the Appeals Council denied her request for further review. (Tr. 126-31). She then applied for SSI on April 18, 2014, alleging a disability-onset date of November 24, 2009. (Tr. 210-15). Ms. Lutizio later amended her onset date to April 28, 2014. (Tr. 231, 879). The claims were denied initially and on reconsideration. (Tr.

1

132-61). Ms. Lutizio then requested a hearing before an Administrative Law Judge. (Tr. 174-76). On May 26, 2016, after the hearing, the ALJ determined Ms. Lutizio was not disabled. (Tr. 7-25, 52-101). After the Appeals Council again denied her request for review, Ms. Lutizio filed a Complaint in this Court. (Tr. 1-6, 967-80).

While awaiting this Court's decision, Ms. Lutizio reapplied for benefits and was determined disabled as of August 7, 2017. (*See* Tr. 1016). On July 23, 2018, the District Court reversed the ALJ's May 26, 2016 decision and remanded the case. (Tr. 1-6, 932-66). On February 2, 2019, the Appeals Council directed the ALJ to offer Ms. Lutizio another hearing, take any action needed to complete the administrative record, and issue a new decision for the period of April 28, 2014 to August 6, 2017. (Tr. 1016; *see* 20 C.F.R. 416.1483(a)). On April 14, 2020, the ALJ issued another unfavorable decision. (Tr. 1018-41). On February 14, 2022, the Appeals Council assumed jurisdiction and remanded the case again because the ALJ's decision suffered from the same infirmities as the decision reversed and remanded by this Court. (Tr. 1044-46; *see* 20 C.F.R. § 416.1484(c)).

A different ALJ held administrative hearings in July and October 2022, and then issued an unfavorable decision. (Tr. 874-931). Ms. Lutizio did not file exceptions to the ALJ's decision, and the Appeals Council did not assume jurisdiction, making the hearing decision the final decision of the Commissioner. *See* 20 C.F.R. § 416.1484(d). She timely filed this action on August 29, 2023. (ECF #1).

FACTUAL BACKGROUND

### I.      Personal and Vocational Evidence

Ms. Lutizio was 51 years old on the alleged onset date and 54 on August 7, 2017, the end

of the adjudicative period at issue. (Tr. 210). She previously worked as a gas station clerk/cashier,

office cleaner, assembler worker, waitress, and bartender. (Tr. 65-66).

### II.     Relevant Medical Evidence

On February 8, 2013, Ms. Lutizio presented to the emergency department with complaints

of back, knee, finger, and facial pain after having fallen two weeks previously. (Tr. 371-374).

Examination revealed tenderness in her left fourth finger and left lumbar paraspinal region. (Tr.

372). Otherwise, her gait and muscle strength were normal. (*Id.*). An X-ray of her left hand

revealed a distal segment avulsion fracture, advanced osteoarthritic changes within the first

carpometacarpal joint with joint space narrowing and spurring, and minor degenerative spurring

within the third metacarpophalangeal joint. (Tr. 373, 435). Ms. Lutizio's fracture was immobilized,

and she was discharged in stable condition. (Tr. 374).

On May 22, 2013, an X-ray of Ms. Lutizio's right knee revealed "advanced medial

femorotibial compartment narrowing, mild to moderate lateral and medial patellofemoral

narrowing with tricompartmental osteophytes" and a small joint effusion. (Tr. 544).

The next day, Ms. Lutizio presented to primary care physician Anthony J. Finizia, M.D.,

with complaints of right-sided neck tingling radiating to her right arm. (Tr. 365). Examination

revealed mild paraspinal spasm and was otherwise normal. (*Id.*). Dr. Finizia ordered imaging of Ms.

Lutizio's neck "for etiology of radicular symptoms." (*Id.*).

3

On June 4, 2013, a cervical spine X-ray revealed "moderately severe degenerative disease" marked by the following: narrowing of multiple intervertebral disc spaces and intervertebral neural foramina. Spurring is noted from multiple endplates anteriorly. There is no evidence of fracture or dislocation. Increased reactive sclerosis of the facet joint at the C7-T1 level is present. (Tr. 433).

On June 6, 2013, Ms. Lutizio returned to Dr. Finizia with continued complaints of right-neck pain and right-arm numbness and tingling. (Tr. 363-64). He assessed cervical spondylosis without myelopathy, referred her for a course of physical therapy, and requested a physical medicine and rehabilitation specialist to consider injections. (Tr. 364).

On July 3, 2013, Ms. Lutizio presented to Dr. Finizia complaining of right-leg numbness and right-neck numbness radiating to her right upper arm. (Tr. 361). On examination, Dr. Finizia noted painful range of motion without spasms and normal upper extremity reflexes and strength; he did not memorialize lower extremity or back examinations. (*Id.*). Dr. Finizia assessed cervical radiculitis and lumbar radicular pain. (*Id.*). He ordered lumbar spinal X-rays and increased Neurontin and Pamelor. (*Id.*).

On July 10, 2013, Ms. Lutizio's cervical spine MRI revealed the following:

Multilevel degenerative changes are present. At the C3-C4 level, there is uncovertebral spurring and advanced facet arthropathy causing mild flattening of the thecal sac without significant canal [ ]narrowing. There is moderate bilateral foraminal narrowing. At the C4-C5 level, there is uncovertebral spurring causing severe left foraminal and mild to moderate right foraminal narrowing. No significant canal stenosis is present. At the C5-C6 level, there is uncovertebral spurring and advanced facet arthropathy causing mild canal stenosis with mild flattening of the spinal cord and moderate bilateral foraminal narrowing. At the C6-C7 level, there is uncovertebral spurring and facet arthropathy causing mild canal stenosis and severe bilateral neural foraminal narrowing. At the C7-T1 level, there is uncovertebral spurring and ligamentum flavum hypertrophy causing mild canal stenosis and mild to moderate left neural foraminal narrowing. There is no frank disk extrusion.

4

(Tr. 431).

On August 23, 2013, a lumbar spine MRI revealed multilevel degenerative changes

demonstrating progression at L1-L2, L2-L3, and L3-L4, as follows:

> At L1-L2, there has been interval progression of degenerative changes resulting in
> mild to moderate anterior CSF space effacement. There is no evidence of root
> compression. At L2-L3 there has been interval progression degenerative changes.
> There is a broad-based disc osteophyte complex resulting in moderate canal
> stenosis. Bilateral facet arthropathy. Mild bilateral neural foraminal stenosis. At L3-
> L4 slight interval progression of the degenerative changes with disc osteophyte
> complex and broad- based. In addition there is has been progression of bilateral
> facet arthropathy with a development of a right-sided probable calcified rim
> synovial cyst resulting in moderate to severe canal narrowing and compression of
> the right L4 nerve root. At L4-L5 no significant change in the degenerative disease
> with disc osteophyte complex. Bilateral facet arthropathy. In addition the
> intervertebral epidural lipomatosis posteriorly resulting in moderate thecal sac
> compression. There is mild bilateral neural foraminal stenosis.

(Tr. 430).

In October 2013, Ms. Lutizio returned to Dr. Finizia with complaints of right knee pain,

cervical radiculitis with radiation to the right arm, hip pain, and chronic mid-back pain. (Tr. 357).

She explained her prior pain management provider lost prescribing privileges. (*Id.*). Dr. Finizia

referred her to a new pain management physician and agreed to refill pain medications until she

could establish care. (*Id.*).

On January 3, 2014, Ms. Lutizio presented to the emergency department with right wrist

pain after falling on the ice the night before. (Tr. 352-53). Examination revealed bony tenderness

in her thumb and the dorsal aspect of her hand and wrist, normal range of motion in all four

extremities, intact distal pulses, intact sensation, and normal gait. (Tr. 353). Vicodin provided

some relief. (Tr. 354). Ms. Lutizio was diagnosed with a hand and wrist strain and discharged in

stable condition with a wrist splint. (*Id.*).

On January 13, 2014, right hand and wrist X-rays revealed advanced osteoarthritis within the first carpometacarpal joint and arthritic changes involving the carpal metacarpal articulation of the thumb within the second and third metacarpophalangeal joints with mild subluxation. (Tr. 427).

Later that month, Ms. Lutizio returned to Dr. Finizia with complaints of right elbow and low back pain. (Tr. 350). Examination revealed medial elbow tenderness and pain with range of motion. (Tr. 351). Dr. Finizia noted Ms. Lutizio's prior referrals to a rheumatologist and pain management specialist and ordered imaging of her right elbow. (*Id.*).

On March 19, 2014, Ms. Lutizio presented to rheumatologist Sobia Hassan, M.D., and rheumatology fellow Bassam Alhaddad, M.D. (Tr. 344-47). There, she complained of severe degenerative joint disease of the neck and lower back, shooting pain from the neck down the arm, shoulder pain, and morning stiffness all over. (Tr. 345). The stiffness in her back and hands lasts about a half hour. (*Id.*). Ms. Lutizio endorsed ulnar deviation of the right hand at the metacarpophalangeal joint. (*Id.*). She had a left knee replacement in April 2011 and indicated the need for a right knee replacement. (*Id.*). On examination, Dr. Alhaddad noted tenderness with shoulder abduction, tenderness of the right elbow with mild flexion contracture, ulnar deviation and bilateral bony swelling of the metacarpophalangeal joint, squaring of the thumbs, bilateral tenderness of the trochanteric bursa of the hips, and tenderness in the toes. (Tr. 346). Ms. Lutizio had full grip strength and full range of motion in her wrists, hips, knees, and ankles. (*Id.*). An X-ray of Ms. Lutizio's right elbow showed a fracture of the right radial neck. (Tr. 347, 426). Dr. Alhaddad ordered lab work to rule out inflammatory arthropathy. (Tr. 347).

On March 24, 2014, Ms. Lutizio presented to orthopedic surgeon Kevin Malone, M.D., for evaluation of her right elbow fracture. (Tr. 340-43). Examination revealed functional range of motion. (Tr. 341). Dr. Malone assessed right radial neck fracture and discussed surgery as an option but noted "[i]t is unlikely that she goes to a completely pain-free situation." (*Id.*). Ms. Lutizio opted for surgery. (*Id.*).

On April 9, 2014, Ms. Lutizio underwent right elbow radial head arthroplasty to fix the nonunion fracture. (Tr. 328-37). Shortly thereafter, on April 16, 2014, she presented to the emergency department with complaints of shortness of breath and cough for three days. (Tr. 303-26). She was admitted for treatment of COPD exacerbation and acute bronchitis. (Tr. 305, 324). While hospitalized, a CT scan revealed an "aneurysmal dilatation of the ascending thoracic aorta." (Tr. 325, 420). She was discharged on April 21 and instructed to follow up with her primary care physician. (Tr. 324-26).

On April 22, 2014, Ms. Lutizio followed up with Dr. Finizia to discuss the incidental findings during her hospital stay, including the aortic aneurysm, a lung nodule, and a liver lesion. (Tr. 301). Dr. Finizia ordered lab work, advised Ms. Lutizio to consider a vascular surgery evaluation to assess the aneurysm, ordered a chest CT to investigate the lung nodule, and ordered a liver ultrasound. (Tr. 302).

On April 24, 2014, Ms. Lutizio returned to Dr. Malone for evaluation of her right elbow. (Tr. 301). Dr. Malone noted she could tolerate "gentle motion" in her elbow. (*Id.*). He referred her to occupational therapy for a formal post-operative rehabilitation program. (*Id.*).

On May 14, 2014, four days after falling down six steps, Ms. Lutizio underwent X-rays of her right elbow and lumbar spine. (Tr. 294, 412). The right elbow X-ray revealed her radial head

orthopedic prosthesis was intact. (Tr. 412). The lumbar spine X-ray showed mild disc space narrowing at L2-L3, L3-L4, and L4-L5, as well as end plate osteophyte formation and vascular calcifications. (*Id.*).

The following day, Ms. Lutizio met with Dr. Malone for follow-up regarding her right elbow. (Tr. 293-94). On examination, Dr. Malone noted Ms. Lutizio had full elbow extension, no evidence of elbow instability, and "normal radial motor, ulnar motor, and sensory examination of the hand." (Tr. 294). Dr. Malone reviewed the previous day's elbow X-ray and saw trace amounts of heterotropic bone along the anterior radial neck. (*Id.*).

On May 22, 2014, Ms. Lutizio underwent bilateral knee X-rays. (Tr. 543). Her left knee showed post-surgical changes compatible with left knee arthroplasty and the surgical hardware was intact. (*Id.*). Right knee imaging revealed pan-compartmental degenerative change with periarticular osteophytosis and narrowing of the medial tibiofemoral joint compartment. (*Id.*). There was also patellar spurring, mild narrowing of the medial patellofemoral joint space, moderate joint effusion, and "a new well corticated calcification" that "could be an intra-articular loose body." (*Id.*)

On June 5, 2014, Ms. Lutizio presented to Preeti Gandhi, M.D., for a pain management evaluation. (Tr. 575-82). There, she complained of aching, burning pain in her neck, right arm, right leg, and low back. (Tr. 575). Ms. Lutizio also endorsed numbness and tingling in her hands and fingers. (Tr. 576). She reported that acupuncture, physical therapy, pool therapy, heat, ice packs, massage, nerve blocks, injections, and use of a TENS unit failed to relieve her pain. (Tr. 575, 577). Ms. Lutizio indicated she could stand for 5 minutes, sit for 30 minutes, and walk for 5 minutes. (Tr. 575).

8

On examination, Dr. Gandhi noted mild to moderately painful range of motion testing and tenderness to palpation in her cervical and lumbar spine, a slow and antalgic gait, and diffuse hyperreflexia and hyperalgesia. (Tr. 578-579, 582). Dr. Gandhi told Ms. Lutizio she was not a good candidate for long-term opioid treatment and offered back injections, but she "did not seem interested." (Tr. 582). Dr. Gandhi recommended pool therapy at least three times per week for 30 minutes and referred Ms. Lutizio to the Chronic Pain Rehabilitation Program at the Cleveland Clinic to help her "resume normal function, regain physical strength and endurance, learn coping skills and stress reduction, get psychological cognitive training, become free of addicting drugs, reduce level of pain . . . ." (*Id.*).

On July 10, 2014, an echocardiogram revealed normal left and right ventricle systolic function, a dilated left atrium, and a dilated ascending aorta, described as mild to moderate. (Tr. 570-71). On July 18, 2014, a chest CT showed centrilobular emphysema. (Tr. 564-65).

Ms. Lutizio was scheduled for a total right knee replacement in January 2015. (*See* Tr. 627). On December 17, 2014, during an office visit with Dr. Finizia, she considering postponing her surgery until the spring because her parents were ill, and she was worried about them being "out in winter." (Tr. 628). Dr. Finizia documented a limited examination, noting normal lung, cardiovascular, and neck findings, and that Ms. Lutizio was "interactive, nontoxic, and in [no acute distress]." (Tr. 629). He agreed to provide pain medication until surgery. (*Id.*).

Ms. Lutizio followed up with Dr. Finizia for medication refills on February 25 and April 29, 2015. (Tr. 637-640, 701-704). In April, she explained needing to reschedule her total knee replacement again because her mother was diagnosed with cancer, required chemotherapy, and needed her help. (Tr. 702).

9

Ms. Lutizio returned to Dr. Finizia in July, October, and December 2015, where Dr. Finizia conducted similarly limited physical examinations without abnormal findings. (Tr. 698-700, 737-41, 768-772, 783-788). In October, she complained of trigger finger in the right thumb and reported an upcoming appointment for evaluation. (Tr. 737, 771). In early December, Ms. Lutizio complained of increased hand pain at night, for which she was being treated by orthopedist Kim Sterns, M.D. (Tr. 768). Dr. Finizia increased Neurontin and Percocet and prescribe Elavil. (Tr. 769). At the end of the month, Ms. Lutizio informed the doctor that she needed to postpone the procedures for her hand and knee again on account of her mother's illness. (Tr. 783).

On February 2, 2016, Dr. Finizia again noted Ms. Lutizio had yet to undergo surgeries for bilateral carpal tunnel syndrome and knee osteoarthritis. (Tr. 822). He increased Elavil and refilled her medications. (Tr. 823).

On April 27, 2016, Ms. Lutizio met with Dr. Finizia and complained of new left elbow pain and low back pain. (Tr. 1947). Dr. Finizia did not document a detailed physical examination but assessed her with low back pain without sciatica, osteoarthritis of the knee, and carpal tunnel syndrome. (Tr. 1948). He refilled Ms. Lutizio's medications and encouraged her to schedule an evaluation with her orthopedic doctor. (*Id.*).

On June 1, 2016, Ms. Lutizio met with Dr. Finizia and reported an upcoming appointment with the orthopedist. (Tr. 1950). Physical examination of the right knee revealed crepitus and mild swelling. (Tr. 1951). Dr. Finizia continued her medications. (*Id.*).

On September 28, 2016, Ms. Lutizio informed Dr. Finizia that she needed to defer the knee surgery scheduled in October because her brother died two weeks prior and her mother is not taking it well. (Tr. 1962).

10

On March 23, 2017, Ms. Lutizio met with Dr. Finizia and complained of right-sided neck pain and endorsed pain with range of motion. (Tr. 1984). Dr. Finizia prescribed baclofen. (Tr. 1985).

On April 27, 2017, Ms. Lutizio complained of continued neck pain and stiffness and described lower extremity cramping with baclofen. (Tr. 1987).

On June 26, 2017, Ms. Lutizio endorsed some increased knee pain that she attributed to the change in weather. (Tr. 1990). On July 20, 2017, she indicated surgery was not an option because she had to take care of her parents, but she would be getting knee injections. (Tr. 2005).

## III.    Medical Opinions

On August 3, 2014, state agency physician Abraham Mikalov, M.D., reviewed Ms. Lutizio's medical records and assessed her residual functional capacity (RFC). (Tr. 141-42). Dr. Mikalov adopted the RFC assessment announced in the ALJ decision dated October 17, 2012, which included the following restrictions: Ms. Lutizio could lift and carry 20 pounds occasionally, 10 pounds frequently; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; had limited push/pull capacity in her right lower extremity; could never climb ladders, ropes, scaffolds; could only occasionally stoop, kneel, crouch, and crawl; and was limited bilaterally in her ability to reach overhead. (*Id.*).

On December 10, 2014, state agency physician William Bolz, M.D., reviewed updated medical records and adopted Dr. Mikalov's conclusions. (Tr. 155-56).

On April 29, 2015, Dr. Finizia completed a Medical Source Statement regarding Ms. Lutizio's physical capacity. (Tr. 645-46). He opined Ms. Lutizio could lift and carry 10 pounds occasionally and less than 10 pounds frequently, identifying carpal tunnel syndrome and

osteoarthritis of the thumb as medical findings in support of his assessment. (Tr. 645). Dr. Finizia also determined Ms. Lutizio could stand/walk for a total of one hour during an eight-hour workday and for less than one hour without interruption due to osteoarthritis of her knees. (*Id.*). He concluded she had no limitations in her ability to sit but could rarely climb, balance, stoop, crouch, kneel, and crawl. (*Id.*). Dr. Finizia further found Ms. Lutizio was limited to occasional reaching, pushing/pulling, and fine and gross manipulation. (Tr. 646). He concluded she would need to be able to alternate positions between sitting, standing, and walking at will, and would require additional unscheduled rest periods during an eight-hour workday outside of standard breaks. (*Id.*). Finally, Dr. Finizia noted Ms. Lutizio suffered from severe pain that would interfere with concentration, take her off task, and cause absenteeism. (*Id.*).

IV.    **Administrative Hearing**

Ms. Lutizio's father drove her to the 2016 administrative hearing. (Tr. 59). She testified to living with her parents, who are both in their 70s, on the third floor of their house, a situation she described as being "not easy to deal with" because she has two bad knees. (*Id.*). Ms. Lutizio last worked in 2010 at a gas station. (Tr. 63).

Ms. Lutizio cannot work because of the pain in her hands and knees. (Tr. 66). Her left knee, previously replaced in 2011, continues to ache after use. (Tr. 67). Her right knee became bothersome after the left knee surgery, and she needs a total replacement. (Tr. 68). She also has constant aches and sharp pains in her back. (*Id.*). She did not undergo neck surgery because she was unable to stop smoking for six months. (*Id.*). She completed therapy for her knees in 2011 and received injections, the most recent of which was in 2015. (Tr. 69, 86). Ms. Lutizio takes three doses of Percocet each day for her back and knees, which helps dull some of the pain, but she still

finds it difficult to walk. (Tr. 70). She can stand and walk for about 15 minutes at a time and has difficulty with bending at the waist, squatting, and kneeling. (Tr. 78, 87-88). About a half hour into the administrative hearing, Ms. Lutizio asked to stand up from a seated position. (Tr. 78, 90). She testified this represents the average amount of time she can sit uninterrupted. (Tr. 90).

Ms. Lutizio underwent bilateral carpal tunnel release surgeries in 2012 and needs repeat surgeries on both hands. (Tr. 71). Injections did not provide relief. (Tr. 72). She has a brace for the left hand and takes Neurontin. (Tr. 71). In addition, she has difficulty controlling her thumbs, causing her to drop things often. (Tr. 71-72). She cannot lift much weight as a result and struggles to use buttons and tie her shoes. (Tr. 85). Ms. Lutizio's mother does the household shopping, laundry, and yardwork. (Tr. 80-81). Ms. Lutizio can prepare meals in the microwave, load a dishwasher, pick up around the house, and sweep. (Tr. 81).

Ms. Lutizio attended another administrative hearing in July 2022. Limiting her testimony to the relevant period at issue—April 2014 to August 2017—Ms. Lutizio claimed issues with both standing and walking. (Tr. 909). She stated it was "impossible" for her to walk on her knee, but she postponed the knee surgery because her parents had cancer and required her help, and she did not have time to recover from a surgery or care for herself. (Tr. 909-10). Her father died in 2014 and her mother died in 2016. (Tr. 910). Ms. Lutizio helped her parents by cooking meals, doing laundry, and sorting and distributing medication. (Tr. 915). She must take frequent breaks between chores. (Tr. 923). When her knee swells from overuse, typically after about 45 minutes, she sits and elevates her right leg for about an hour. (Tr. 917).

The VE testified that a person of Ms. Lutizio's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could not perform past

relevant work but could perform work as a garment sorter, hand bander, and housekeeping cleaner, all light, unskilled positions. (Tr. 891-92). The individual would be precluded from performing full-time work if further limited to occasional handling and fingering. (Tr. 893). Similarly, the individual could not perform competitive work if she required a sit/stand option. (Tr. 895-96). Finally, the VE stated employers tolerate no more than 10% off-task time during the workday and no more than one absence per month. (Tr. 896).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Lutizio had not engaged in substantial gainful activity since April 28, 2014. (Tr. 841). At Step Two, the ALJ identified the following severe impairments: degenerative disc disease of the cervical and lumbar spines; osteoarthritis; degenerative joint disease of the bilateral knees; bilateral carpal tunnel syndrome; asthma; an affective disorder; an anxiety disorder; and substance addiction disorders. (*Id.*). At Step Three, the ALJ found Ms. Lutizio does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Tr. 842).

The ALJ determined Ms. Lutizio's RFC as follows:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she could lift and/or carry up to 20 pounds occasionally, 10 pounds frequently; sit for up to six hours in an eight-hour workday, and stand and/or walk for up to six hours in an eight-hour workday. She could occasionally use right foot controls. She could never climb ladders, ropes, and scaffolds, and never crawl. She could occasionally climb ramps and stairs, stoop, kneel, and crouch. She could occasionally reach overhead, and reaching in all other direction is unlimited. She could perform frequent handling and fingering. She needed to avoid concentrated exposure to respiratory irritants. She could do no commercial

driving and no work operating dangerous moving machinery, such as power saws and jack hammers. And she could understand, remember, and apply information to complete simple instructions in a setting that did not require strict hourly production quotas.

(Tr. 845).

At Step Four, the ALJ found Ms. Lutizio cannot perform her past relevant work as a salesclerk. (Tr. 863). At Step Five, the ALJ determined jobs exist in significant numbers in the national economy that she can perform. (Tr. 863-64). Therefore, the ALJ found Ms. Lutizio was not disabled. (Tr. 865).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

16

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); accord *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

DISCUSSION

Ms. Lutizio brings two issues for review: (1) the ALJ erred in rejecting Dr. Finizia's opinion; and (2) the ALJ's RFC is not supported by substantial evidence. (ECF #12 at PageID 2107, 2114). Neither prove persuasive.

## I.     The ALJ did not err in assigning Dr. Finizia's opinion little weight.

For disability claims filed before March 27, 2017, the rules in 20 C.F.R. § 416.927 apply. A treating source opinion must be given "controlling weight" if the opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 416.927(c)(2). "[A] finding that a treating source medical opinion . . . is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in" § 416.927." *Id.*; *see also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence.") (citations omitted).

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

18

medical opinion and the reasons for that weight." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242

(6th Cir. 2007) (quotation omitted). This requirement serves two purposes. First, a sufficiently

clear explanation allows a claimant to understand the disposition of her case. *Wilson,* 378 F.3d at

544. Second, the explanation "ensures that the ALJ applies the treating physician rule and permits

meaningful appellate review of the ALJ's application of the rule." *Id.* The failure to articulate "good

reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence,

even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at

243.

> The ALJ evaluated Dr. Finizia's opinion as follows:

> The opinions of Dr. Finizia were given little weight, and not controlling weight for multiple reasons. As an initial matter, the undersigned notes that Dr. Finizia is an acceptable medical source. However, the opinions of Dr. Finizia were inconsistent with the record as a whole. For example, the opinions at Exhibit B11F from April 29, 2015, correspond with treatment notes at Exhibit B14F/28-29. Despite the very significant, and debilitating opinions give at that time, the claimant's examination findings at that time consisted entirely of the following findings, she was interactive, nontoxic, and in no acute distress; her neck was supple, and she had no thyromegaly; she had regular cardiovascular rate and rhythm, and no edema or carotid bruits; and her lungs were clear to auscultation, bilaterally, with symmetrical chest rise. Nothing in this physical examination conducted on the date he provided the opinion supports or is indicative of the very significant limitations that he opined at the same time.

> The opinions of Dr. Finizia were an overstatement of the claimant's limitations. Although there is evidence that supports a diagnosis of cervical and lumbar spine degenerative disc disease, and osteoarthritis in the hands, and degenerative joint disease in the knees, the evidence does not support limiting her to a mere one hour maximum of standing and/or walking in a workday. Rather, the claimant's treatment notes indicated that she was able to get around in the community without an assistive device, and she told the consultative examiner that she could do all activities of daily living, including cooking and preparing food, general cleaning, laundry, shopping, managing money, and using public transportation.

> Additionally, the record supports that the claimant had told Dr. Finizia that she put off having her right knee surgery because she helped her mother who had

cancer; she would babysit her grandchild twice a week; she lived in the upstairs unit of an up/down house, with her bedroom on third floor; and she preferred to use the bathroom in the basement rather than on the second floor. All of this was an indication that she was more than adequately able to walk/stand more than one hour in an eight-hour workday. Additionally, the upper extremity symptoms and diagnoses did not explain or support the significant restriction opined by Dr. Finizia concerning limiting the claimant to standing and/or walking for one hour total in an eight-hour workday. Additionally, Dr. Finizia did not document observing any knee or gait abnormalities in his treatment notes that would support the one-hour stand/walk limit, or the need for an additional break or absenteeism.

Many of the claimant's office visits with Dr. Finizia do not document a detailed physical examination that assessed muscle strength, gait, muscle tone, sensation etc. to support these limitations. Rather, the treatment notes with Dr. Finizia routinely did not document any musculoskeletal or neurological examination findings. He did little more than document that the claimant was interactive, nontoxic, and in no acute distress. He documented that she had normal examination findings concerning her lungs, cardiovascular system, and external portions of her neck.

His opinion is also not consistent with other examination findings either obtained by consultants the claimant saw or for emergency room visits. For example, rheumatology treatment notes from March of 2014, Dr. Bassam Alhaddad, MD, noted that the claimant had tenderness in her shoulders, elbows and hips; but she had full grip strength; and full range of motion in her wrists, hips, knees and ankles. The claimant was seen in the emergency room on May 14, 2014, after tripping and falling at home. Examination findings noted no abrasions or bruising, erythema, or induration. Left hip heel strike is negative no tenderness with rotation of the hip. Moves all four extremities. No calf tenderness and no edema. Right radial head with soft tissue swelling surrounding elbow [likely from earlier surgery]. Range of motion is intact. Distal capillary refill takes less than 2 seconds. Radial pulses are 2+ bilaterally. Distal sensation and motor intact. Neurologically, strength is 5/5 bilateral lower extremities, upper knee flexion/extension ankle dorsi-flexion; ankle plantar-flexion, great toe extension. No sensory deficits to light touch. No acute focal neurological deficits can be appreciated. Psychiatric—good eye contact. Appropriate in content/context. Normal affect. The claimant was seen by Kevin Malone, M.D., for follow up of elbow surgery on May 15, 2014. He noted she made good progress, no complications with full elbow extension and full forearm rotation. There was no evidence of elbow instability. She had normal radial motor, ulnar motor and sensory exam of the hand. Examination in the ER for abdominal discomfort on September 24, 2015: "Extremities: no edema moves all equally."

It also bears mentioning that Dr. Finizia mostly treated the claimant's symptoms that she complained about at any given visit, and he did not generally fully examine the claimant. For example, in treatment notes from July, October, and December

of 2015, Dr. Finizia conducted limited physical examinations with no abnormal findings. He tracked the claimant's progress towards scheduling knee and hand surgery, and refilled her pain medications. And he increased the claimant's Neurontin and temporarily increased her Percocet, in response to her complaints of increased hand pain. It also bears mentioning that Dr. Finizia is not an orthopedic specialist, a neurologist, or a pain management specialist. Rather, his is a general, primary care practitioner. Thus, his opinions are not given as much weight as if he were a specialist.

Finally, the record supported that the claimant presented to Dr. Finizia on nine occasions between May 2013 and his April 29, 2015, opinion. The USDC and Appeals Council indicated that the Administrative Law Judge should provide reasons for rejecting Dr. Finizia's limits for sit/stand at will, and pain necessitating beaks and absenteeism. They also cited to MRI's, X-rays, and physical examination findings, and indicated that those objective findings should be considered as it relates to the opinions of Dr. Finizia. However, the undersigned notes that the examination findings corresponding with Dr. Finizia's treatment notes during the period from May of 2013, through April 29, 2015, did not document findings, including musculoskeletal or neurological examination findings. Thus, his treatment notes lacked supportive evidence of the sit/stand at will option opined by Dr. Finizia, or that the claimant had objective findings of pain, necessitating breaks and absenteeism as opined by Dr. Finizia. As for the reasons noted in this decision, the undersigned finds that the MRI's, X-rays, and physical examination findings cited to by the USDC and Appeals Council are supportive of finding her physical conditions as medically determinative impairments and for limiting the claimant to a range of light work as found in this decision. However, the diagnostic findings do not support greater limitations standing alone. The evidence addressed above regarding the claimant's physical abilities and limitations outweigh the information provided in the test results. For all of these reasons, the opinions of Dr. Finizia were given little weight, and not controlling weight.

(Tr. 859-61).

According to Ms. Lutizio, none of the reasons the ALJ cited above are "good reasons" for assigning little weight to Dr. Finizia's opinion. First, she takes issue with the ALJ's determination that the opinion was inconsistent with the record as a whole. The ALJ compared Dr. Finizia's opinion from April 29, 2015 with his treatment note from the same day, aptly identified the discrepancy between the very significant limitations and the normal findings on physical examination, and determined this undercut the supportability of his opinion. (Tr. 859-60). Ms.

21

Lutizio believes the only inferences that can be made from Dr. Finizia's lack of detailed physical examinations are that Dr. Finizia left such examinations for the orthopedist and had knowledge of the severity of her condition. (ECF #12 at PageID 2109-10). I note, as did the Commissioner, that Dr. Finizia knew Ms. Lutizio intended to have knee surgery but knew no other details: he requested Ms. Lutizio provide orthopedic medical records but she did not. (Tr. 769, 783). Therefore, the ALJ reasonably concluded that Dr. Finizia's own medical records, which document very few abnormal clinical findings and do not contemplate findings made by the orthopedic specialist, do not support the significant limitations he assessed.

Ms. Lutizio takes specific issue with the ALJ's determination that physical examination findings in Dr. Finizia's treatment notes do not support his opinion that she requires a sit/stand option or additional breaks and absences, arguing that this ignores other evidence consistent with such a limitation. But supportability, which contemplates what relevant evidence the medical source presents to support a medical opinion, and consistency, which looks to evidence in other records, are two separate considerations. (*See* 20 C.F.R. §§ 416.927(c)(3) and (4)). The ALJ's conclusion that Dr. Finizia's sit/stand opinion is not well-supported does not signify that the ALJ failed to consider the consistency of the opinion with other evidence. In fact, the ALJ explicitly did consider other evidence of record, including consultative examination findings and emergency department records. (Tr. 860-61).

Last, Ms. Lutizio claims the ALJ cherry-picked the evidence, ignoring findings consistent with Dr. Finizia's opinion, including diagnostic imaging and abnormal findings. (ECF #12 at PageID 2110). But the ALJ acknowledged all the evidence Ms. Lutizio claims was ignored (*see* Tr. 846-47), and stated the evidence supported finding her physical conditions as medically

determinable impairments and for limiting her to light work, but did not support greater limitations because evidence of Ms. Lutizio's physical abilities and limitations outweighed the information provided in those test results (Tr. 861). The ALJ did not ignore those findings but reasonably weighed them against evidence showing Ms. Lutizio was not as limited as she claimed. Such inconsistencies between reported activities and the treating physician's medical reports provide substantial evidence to support the ALJ's findings. *Rottman v. Comm'r of Soc. Sec.,* 817 F.App'x 192, 196 (6th Cir. 2020).

Largely, these arguments assert that the ALJ ignored evidence that was contradictory to her finding of non-disability. But the evidence Ms. Lutizio emphasizes as supportive of greater limitations is the same evidence the ALJ explicitly acknowledged in the written decision. Asking this Court to re-examine evidence the ALJ has clearly considered is tantamount to reweighing the evidence, a form of review not permitted here. It bears repeating that in determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard*, 889 F.2d at 681. I decline to remand on this basis.

## II. The ALJ's RFC is supported by substantial evidence.

Ms. Lutizio next claims the ALJ's RFC is not supported by substantial evidence because "the ALJ relied on selective portions of the medical record to determine Ms. Lutizio's functional capacity." (ECF #12 at PageID 2114). She takes issue with the ALJ's conclusion that she can frequently handle and finger, suggesting that hand imaging showed advanced osteoarthritis and demonstrated she is more limited. (*Id.* at PageID 2115). She also finds error in the ALJ's conclusion that the diagnostic imaging, including advanced knee arthritis, progressive lumbar

spine degeneration, and severe cervical neural foraminal narrowing, did not support further limitation in her abilities to stand and walk. (*Id.* at PageID 2115-16).

A claimant's RFC is defined as the most a claimant can still do despite the physical and mental limitations resulting from her impairments. 20 C.F.R. § 416.945(a). The ALJ alone is responsible for determining a claimant's RFC. 20 C.F.R. § 416.946(c). The RFC must be based on all relevant evidence in the record, including medical evidence, medical reports and opinions, the claimant's testimony, and statements the claimant made to medical providers. 20 C.F.R. § 416.945(a); *see also Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010). "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F.Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F.App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to consider all evidence before him when he makes a residual functional capacity determination, and must also mention or refute contradictory, objective medical evidence presented to him.") (cleaned up)).

Here, the ALJ thoroughly summarized the medical record and acknowledged all relevant imaging, including MRIs of the spine showing progressive degeneration and X-rays of the hands showing advanced osteoarthritis, but noted that "diagnostic findings alone do not mandate the conclusion that the claimant is more limited than indicated in the RFC" (Tr. 847) and provided a thorough explanation of the other factors, including her response to treatment, objective clinical findings showing relatively little impairment, her disinterest in low back injections that could help alleviate her pain, her decision to put off knee surgery for more than eight years, and statements

24

about her ability to function on a daily basis, that informed her assessment of the RFC. For instance, the ALJ noted the rheumatology assessment revealed tender shoulders, hips, and toes, but showed full range of motion without pain in her wrists, knees, and ankles, and a later assessment showing mild to moderate pain with cervical and lumbar range of motion testing and a slow antalgic gait, but normal extremity sensation and good strength in all extremities. (Tr. 848). In conjunction with these physical findings, the ALJ considered the lack of documented findings supporting the severity of her carpal tunnel syndrome, knee, or back conditions. (Tr. 848-49). Finally, the ALJ addressed the inconsistency of Ms. Lutizio's statements regarding the intensity, severity, and effect of her symptoms on her ability to function:

> As an initial matter, the undersigned notes that the claimant's treatment history for her multiple impairments is somewhat inconsistent with her allegations of disabling symptoms during the period in question. Despite the claimant's allegations of disabling symptoms associated with her multiple impairments during the period in question, her treatment history and response to treatment were not indicative of work-preclusive and/or disabling limitations. Despite the claimant's allegations of disabling symptoms associated with her musculoskeletal impairments, she did not require surgical intervention during the period in question on her neck, back, or bilateral knees. The record did indicate that she sought emergency room treatment during the period in question for acute lower back and arm pain. But she did not require neck or back surgery, and she did not require the use of assistive devices to aide in ambulation.

> Furthermore, the claimant's treatment notes indicated throughout the period in question that the claimant was repeatedly considering and scheduled to have right knee replacement surgery. However, through the date of this decision the claimant has consistently put off/postponed having such surgery. Her treatment notes and testimony at the hearings indicated that this was because she did not feel she had the time to care for herself because she was busy taking care of her elderly, ill parents during the same period. However, the claimant's decision to postpone surgical intervention on her right knee throughout the period in question, and even now, more than five years after the period in question, is somewhat inconsistent with her allegations of disabling symptoms during the same period. Especially considering the reason given for the postponement is having to take care of her elderly parents which suggests a higher level of physical and mental functioning than she has alleged.

* * *

The claimant testified at the hearing that because of right knee symptoms and associated functional limitations, it was "impossible" for her to stand and/or walk. However, this statement was internally inconsistent with the claimant's treatment notes with Dr. Finizia, which did not generally document musculoskeletal or neurological examination findings indicating that the claimant had a complete inability to stand and/or walk due to right knee symptoms and associated functional limitations. Furthermore, this statement was internally inconsistent with Dr. Finizia's own opinion at Exhibit B11F, where he noted that the claimant was not prescribed the use of any canes, walkers, braces, or wheelchair to aide in ambulation.

There were also inconsistent statements concerning the claimant's use of her hands. The claimant testified that her thumbs did not work, and therefore she tried not to use her thumbs. However, this was somewhat inconsistent with the claimant's numerous treatment notes indicating that she was the primary caregiver to her elderly, ill parents. Furthermore, it was internally inconsistent with the claimant's testimony that her care for her parents included doing the laundry, attending to chores, sorting medications, and cooking/meal preparation, all of which would require some use of the claimant's hands and thumbs. She also has inconsistently testified regarding laundry and shopping by stating that her mother did the shopping, laundry and yardwork. She said she did some sweeping and "picking up," and is able to cook some meals in the microwave.

She also testified that she babysat her four year old grandson about twice a week. She said she only watches him for short periods of time and reported that her mother was there to assist. It is inconsistent on the one hand to assert that she is providing care to her sick elderly parents but then assert that she needed the assistance of her mother to babysit her grandson.

(Tr. 852-53). Clearly, the ALJ's RFC assessment derived from relevant evidence in the record and the ALJ's conclusions are reasonable and supported by substantial evidence.

Ms. Lutizio makes one last argument that the ALJ played doctor when the ALJ determined she could frequently handle and finger and substituted her opinion for that of Dr. Finizia. (ECF #12 at PageID 2116-17). To the extent Ms. Lutizio argues the ALJ's RFC cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ, the

argument is unpersuasive and has been rejected by the Sixth Circuit. *See Mokbel-Aljahmi v. Comm'r of Soc. Sec.,* 732 F.App'x 395, 401 (6th Cir. 2018). Moreover, the ALJ did not draw medical conclusions from raw medical data but compared the hand X-ray findings to Ms. Lutizio's daily activities, her statements concerning her limitations, and the limited treatment she received for her impairment, and drew conclusions from that other evidence to determine how the advanced osteoarthritis functionally limits her ability to engage in work activities. *See Coldiron v. Comm'r of Soc. Sec.,* 391 F.App'x 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ not a physician ultimately determines a claimant's RFC . . . . An ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding.").

Ms. Lutizio has not identified any error in the ALJ's application of legal standards and the ALJ's conclusions regarding the RFC are supported by substantial evidence. I decline to remand on this basis.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** the Commissioner's decision denying supplemental security income.

Dated: July 16, 2024

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE